IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ADRYAN JEAN-BAPTISTE, | § | |
| | § | No. 455, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No: 2212007663 (K) |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: June 3, 2026
Decided: August 10, 2026

Before **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices.

### **ORDER**

This 10th day of August, 2026, after consideration of the parties' briefs, the argument of counsel, and the record on appeal, it appears to the Court that:

(1) Adyran Jean-Baptiste was convicted of first-degree murder and sentenced to life in prison. He seeks reversal of his conviction on two grounds. First, Jean-Baptiste argues that the Superior Court erred by denying his motion for judgment of acquittal at the close of the prosecution's case-in-chief. Second, he contends that the court plainly erred by failing to declare a mistrial or conduct a *voir dire* examination of the jury when it came to light midway through the trial that courtroom spectators were wearing shirts depicting an image of the murder victim.

Neither ground, for reasons discussed more fully below, is meritorious. Hence, we affirm.

(2)   On March 31, 2021, two individuals—James Fibelkorn and Michael Allaband—witnessed a shooting on Route 14 in Milford, Delaware. Fibelkorn was driving westbound when he saw through his rear-view mirror a sedan quickly approach his vehicle from the rear, in Fibelkorn's words "so close that I couldn't see headlights."[1] According to Fibelkorn, another car overtook the sedan in the passing lane and, when the two vehicles were beside each other, Fibelkorn could see an arm extending out of the car in the passing lane and shooting "five or six times at [the] lady behind [him]."[2] Following the shooting, he saw the driver of the sedan fall forward and the sedan then veer into a field off the roadway.

(3)   Allaband, who was also driving westbound, saw a silver car and a blue SUV pass him "rather quickly."[3] He heard "a few loud pops" and thought one of the tires on his tractor-trailer had blown.[4] Allaband observed the silver car "scoot off into [a] muddy field."[5] Still believing that one of his tires had blown, Allaband pulled over to the side of the road, which he estimated to be 400 feet from where the silver car went off the road. He alighted from his truck to see if tire debris had hit

---

[1] App. to Opening Br. at A117.
[2] *Id.* at A118.
[3] *Id.* at A66.
[4] *Id.* at A66–67.
[5] *Id.* at A66.

2

the silver car. Allaband approached the silver car and saw that it was riddled with bullet holes. Along with other bystanders, he observed the driver "gurgling"; he believed the driver "was fighting, but it was too late."[6]

(4) The driver, later identified as Maricruz Sanchez, was pronounced dead on April 2, 2021. The assistant medical examiner who performed an autopsy on Sanchez determined that she had sustained gunshot wounds to her head and left wrist. The assistant medical examiner concluded that the manner of Sanchez's death was homicide.

(5) Delaware State Police officers investigated the shooting. An evidence technician collected, among other things, ten NFCR .45 caliber auto shell casings and several bullets. Ballistic testing confirmed that the bullets were fired from the same firearm. Additionally, the chief investigating officer, Detective Daniel Grassi, obtained surveillance footage from nearby residences and a chicken farm. A review of that footage revealed that the vehicle suspected to have transported the shooter was a blue 2020 or 2021 Nissan Rogue.

(6) The detective learned that the Nissan was a rental vehicle leased from the Dover branch of Enterprise Rent-A-Car. The rental agreement showed that an individual named Anthony Simpson rented the vehicle. Simpson, however, did not

---

[6] *Id.* at A68.

3

rent the vehicle for himself. He rented the car for his cousin's daughter and her then-boyfriend, Jean-Baptiste.

(7) Detective Grassi also met with two individuals—Ricky Hicks and Lorenzo Williams—both of whom provided Grassi with information about the shooting that resulted in Sanchez's death. Hicks and Williams were incarcerated, for reasons unrelated to this case, at Sussex Correctional Institution ("SCI") where they encountered Jean-Baptiste.

(8) At SCI, Jean-Baptiste admitted to Hicks and Williams that he was involved in the shooting that resulted in Sanchez's death. Jean-Baptiste stated that he was chasing down Sanchez in a rental car and that a passenger named James Eley was the shooter. Jean-Baptiste and Eley were seeking revenge for a shooting in which Delaware State Police suspected Sanchez's boyfriend, Khalil Pitts, of shooting Hicks's son.[7]

(9) Hicks did not, however, condone the shooting of Sanchez, telling Jean-Baptiste that Sanchez was "an innocent girl."[8] Jean-Baptiste insisted, however, that "she wasn't that innocent."[9]

---

[7] *Id.* at A404–05, A453–56. In their conversation at SCI, Jean-Baptiste told Hicks that "Khalil Pitts was [Sanchez's] boyfriend and being that [Pitts] shot [Hicks's] son, that's why he went after her." *Id.* at A453–54.

[8] *Id.* at A458.

[9] *Id.*

4

(10)  On December 19, 2022, Jean-Baptiste was arrested.  A grand jury indicted him on one count of first-degree murder and one count of first-degree conspiracy.  At a pretrial office conference on July 15, 2024, the State entered a *nolle prosequi* on the conspiracy count and later that day proceeded to trial on the first-degree murder charge.

(11)  At trial, Hicks's and Williams's testimony was offered to establish that Jean-Baptiste was the driver of the Nissan involved in the shooting.  Hicks and Williams acknowledged that they had extensive criminal histories and stood to benefit by providing testimony favorable to the State.

(12)  Hicks testified that, during his interview with Detective Grassi, he asked whether he could receive a "Crime Stopper's Reward" in exchange for the information he provided.  He also admitted that he had an interest in protecting his son from being implicated in the murder investigation.  Although Hicks did not receive a monetary reward in exchange for his testimony, he did request and receive a reduction in his sentence shortly after he first discussed his jailhouse conversation with Detective Grassi.  On the stand, Hicks testified that the reduction was unrelated to his discussion with Detective Grassi.

(13)  Williams testified that he entered a cooperation agreement under which the State would move for reconsideration of his sentence in exchange for his

5

testimony. He testified further that he told Detective Grassi during his interview that he wanted to be in contact with his four-month-old son.

(14) Following a recess on the third day of Jean-Baptiste's trial, the trial judge reported to counsel that court staff had informed him that a few—as many as four—courtroom spectators were wearing T-shirts bearing Sanchez's image. The record is clear that neither the trial judge nor counsel had noticed the T-shirts. And we cannot discern whether the spectators had worn the T-shirts from the outset of the trial or only on the day the T-shirts were noticed by court staff.

(15) As it considered how best to balance the spectators' First Amendment rights and the need to protect the jury from an improper influence, the trial court asked for counsel's input. Jean-Baptiste's counsel expressed concern that the image of Sanchez on the T-shirts "could influence the jury" and requested that the spectators be "advised they can't wear those types of shirts during the proceeding."[10] She did not, however, ask the court to declare a mistrial or to take any other remedial action. The State, apparently content with defense counsel's request, did not comment further.

(16) Before the trial resumed, the court ruled:

> [I]t's my decision that [the spectators are] not able
> to wear those shirts during the proceedings going forward.

---

[10] *Id.* at A374.

So we will make whatever accommodations we can to have that switched out as easy as possible . . . . I certainly do not want to discourage the folks who want to watch the proceedings from being able to, but the jury is to make a decision based only on the evidence presented in the case. And the Court finds that the shirts that the individuals are wearing does lead into an outside influence that the Court is not going to permit.[11]

(17) At the conclusion of the State's presentation, Jean-Baptiste moved under Superior Court Rule of Criminal Procedure 29(a) for judgment of acquittal, arguing that the State had not presented sufficient evidence to connect Jean-Baptiste to Sanchez's murder. The prosecutor countered that Jean-Baptiste's confession to Hicks and Williams at SCI constituted sufficient evidence to defeat Jean-Baptiste's motion.

(18) The trial judge denied the motion, finding that

in-court and out-of-court statements admitted into evidence . . . include what was an alleged admission by Mr. Jean-Baptiste that he was involved in this matter and intended to cause the death of Maricruz Sanchez . . . .

There's also other corroborating evidence, such as the vehicle rentals, and motive-related evidence, and other related evidence that corroborates that. But you're dealing with admissions . . . presented by two different witnesses that specifically were Mr. Jean-Baptiste['s] alleged admissions[;] the jury can certainly accept those or reject those as they see fit. But if they accept them, it passes the hurdles required for the denial of a motion for a judgment of acquittal.[12]

---

[11] *Id.* at A376.
[12] *Id.* at A527–28.

(19)   The jury found Jean-Baptiste guilty of first-degree murder and, after a presentence investigation, the court imposed the statutorily mandated life sentence.

(20)   In this appeal, Jean-Baptiste first argues that the Superior Court erred in denying his motion for judgment of acquittal.  In his view, "it is impossible to conclude that any reasonable jury could have convicted him of [murder] based upon the evidence presented at trial."[13]   His critique of the evidence focuses almost exclusively on Hicks's and Williams's status as jailhouse informants.

(21)   We review the Superior Court's denial of Jean-Baptiste's motion for judgment of acquittal *de novo*.[14]  We must decide whether any rational trier of fact, when "viewing the evidence and all the reasonable inferences to be drawn therefrom in the light most favorable to the State,"[15] could find Jean-Baptiste guilty beyond a reasonable doubt of first-degree murder.  More specifically, we ask whether a reasonable jury could decide from the evidence presented that Jean-Baptiste, acting as either a principal or an accomplice, "intentionally cause[d] the death of [Sanchez]."[16]  Our review of the record leads us to conclude that the jury could do so.

---

[13] Opening Br. at 11.
[14] *McGuiness v. State*, 312 A.3d 1156, 1187 (Del. 2024).
[15] *Id.* (quoting *Hopkins v. State*, 293 A.3d 145, 150 (Del. 2023)).
[16] 11 *Del. C.* § 636(a).

(22) Jean-Baptiste's challenge to the sufficiency of the evidence is grounded in an attack on the credibility of Hicks and Williams. Because their testimony—according to Jean-Baptiste, "the linchpin of the State's case"—was "riddled with problems and issues," it was "totally insufficient to sustain [Jean-]Baptiste's conviction."[17] Jean-Baptiste points to the witnesses' "fairly lengthy criminal records,"[18] their cooperation with law enforcement to secure favorable treatment, and the lack of detail and inconsistencies in their testimony. By emphasizing these deficiencies, all of which were highlighted by Jean-Baptiste's counsel during her closing argument to the jury, Jean-Baptiste laid the groundwork for the legal principle he urges us to adopt: that "[j]ailhouse [i]nformants are [p]resumptively [u]nreliable."[19]

(23) Jean-Baptiste's sole legal authority for this sweeping proposition is the United States Supreme Court's decision in *Banks v. Dretke*.[20] *Banks* involved, among other things, the question whether the prosecution's failure to disclose a witness's status as a paid informant violated the defendant's right to exculpatory evidence. The Court held that the failure to disclose the witness's status was improper, emphasizing that the prosecution's witness "as a paid informant was

---

[17] Opening Br. at 11.
[18] *Id.*
[19] *Id.* at 12.
[20] *Id.* (citing *Banks v. Dretke*, 540 U.S. 668 (2004)).

unquestionably 'relevant'; [and that] similarly beyond doubt, disclosure of [the prosecution's witness's] status would have been 'helpful to [the defendant's] defense.'"[21] The Supreme Court also acknowledged that it has "long recognized the 'serious questions of credibility' informers pose."[22] The Court did not, however, hold that paid-informant testimony is presumptively unreliable and categorically not to be credited by the fact-finder.

(24) Jean-Baptiste's per se presumption of unreliability, moreover, departs from the longstanding standard by which our trial courts assess motions for judgment of acquittal. Under that standard, as mentioned earlier, the court considers the evidence and draws all reasonable inferences in the light most favorable to the prosecution.[23] In jury trials, it is for the jury, and not the trial judge, to determine witness credibility and resolve conflicts in testimony.[24] And because our review of a trial court's denial of a motion for judgment of acquittal is *de novo*, we adhere to those same principles—principles that apply no less to the assessment of the credibility of a jailhouse informant with an unsavory past than to the credibility of any other witness.

---

[21] *Banks*, 540 U.S. at 698 (quoting *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957)).
[22] *Id.* at 701 (quoting *On Lee v. United States*, 343 U.S. 747, 757 (1952)).
[23] *See supra* p. 8.
[24] *See Poon v. State*, 880 A.2d 236, 238 (Del. 2005).

10

(25) Like the Superior Court, we conclude that Hicks's and Williams's testimony, if credited and when considered together with the other evidence and all consequent reasonable inferences, is sufficient to support Jean-Baptiste's conviction. As mentioned above, both individuals testified that, while they were incarcerated at SCI, Jean-Baptiste admitted to them that he drove a rental vehicle while Eley shot Sanchez. Hicks also related how Jean-Baptiste had described the car chase that preceded the shooting and the post-shooting efforts to hide the rental car and murder weapon. The jury also learned that the shooting was for revenge and that Jean-Baptiste believed that Sanchez "wasn't that innocent."[25] Another witness, whose credibility is not attacked on appeal, testified that Jean-Baptiste had possession of a rental vehicle, a blue Nissan, for use with his then-girlfriend. And the jury learned that surveillance cameras captured a blue Nissan driving near the location of the shooting. From these facts, a rational jury could conclude beyond a reasonable doubt that Jean-Baptiste directly participated in Sanchez's murder.

(26) Jean-Baptiste also takes issue with the manner in which the Superior Court addressed the prospect that the jury could be improperly influenced by the T-shirts worn by spectators in support of the victim. He believes that there is a "strong risk that he was deprived of his rights [under the Delaware and federal constitutions]

---

[25] App. to Opening Br. at 458.

11

to a fair trial, due process, the presumption of innocence, and confrontation."[26] He contends that the Superior Court had an obligation to *sua sponte* question the jury members to assess whether they were improperly influenced by the shirts or, alternatively, to declare a mistrial. The court's failure to pursue either of those courses of action, he contends, constitutes reversible error. Because Jean-Baptiste did not ask the trial court to declare a mistrial or question the jurors to determine whether they noticed the T-shirts and, if they did, whether their observations influenced their view of the case, we review these alternative claims of error under our plain-error review standard.

(27)   In *Suber v. State*,[27] we explained that Supreme Court Rule 8 limits appellate review to questions "fairly presented to the trial court" unless "the interests of justice so require."[28] The "interests of justice" exception "is extremely limited and reserved only for plain errors that affect a party's substantial rights."[29] Such errors "are [those] apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[30]

---

[26] Opening Br. at 20 (citing U.S. CONST. amend. VI, XIV; DEL. CONST. art. I, § VII).
[27] --- A.3d ---, 2026 WL 184867 (Del. Jan. 15, 2026).
[28] *Id.* at *4 (quoting Supr. Ct. R. 8).
[29] *Id.*
[30] *Id.* at *5 (quoting *Wainwright v. State*, 605 A.2d 1096, 1100 (Del. 1986)).

(28)   A defendant seeking plain-error review carries the burden of showing that "(1) the record is adequate to review his claim, (2) an error occurred, (3) the error is plain, and (4) the error adversely affected his substantial rights by jeopardizing the fairness and integrity of the trial process."[31]   Jean-Baptiste's attempt to meet this burden falls short.

(29)   "[P]lain error assumes oversight; that is, error 'affecting substantial rights . . . not brought to the attention of the court.'"[32]   There was no oversight here. The underlying error—the display of the victim's image on the spectators' T-shirts, potentially influencing the jury—was brought to the court's attention by its alert staff.  And the court, in turn, informed counsel of this development and asked counsel "for help on . . . how to handle the issue."[33]   Jean-Baptiste's counsel responded with a specific request:  direct the spectators to cover the problematic image and advise them that, going forward, they could not wear "those types of shirts" in the courtroom.  And the court acceded to counsel's wishes.  Viewed in this light, Jean-Baptiste's assertion that the trial court erred at all, much less plainly, is puzzling.

(30)   But even if we were to assume that the trial court erred by following Jean-Baptiste's proposed course of remedial action, he has not met his burden of showing prejudice to substantial rights.   In reaching this conclusion, we have

---

[31] *Id.* at *6.
[32] *Tucker v. State*, 564 A.2d 1110, 1118 (Del. 1989) (quoting D.R.E. 103(d)).
[33] App. to Opening Br. at A373.

13

considered that the display of Sanchez's image on the spectators' T-shirts was so inconspicuous as to escape notice by Jean-Baptiste's counsel, the prosecutor, and the court. We also question the extent to which Sanchez's image, if noticed by one or more jurors, would improperly influence the jury as they took in the evidence and reached a verdict. In this regard, it is reasonable, in our view, to assume that jurors understand that, when there are spectators in the courtroom, some of them—especially those sitting behind the prosecutor as was the case here—are affiliated with the victim and support the prosecution. These considerations impel us to reject Jean-Baptiste's contention that the apparently brief and largely unnoticeable display of Sanchez's image on the T-shirts of courtroom observers so compromised the fairness and integrity of Jean-Baptiste's trial as to require reversal.

NOW, THEREFORE, IT IS ORDERED that the Superior Court's judgment of conviction be AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

14